UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | |
|---|---|
| David Retherford, ) | Civil Action No.: 8:05-1471-RBH |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **O R D E R** |
| ) | |
| Wal-Mart Stores, Inc. ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff David Retherford brought this action arising out of his employment with the defendant, Wal-Mart. His complaint alleges causes of action for wrongful termination against public policy; breach of contract based upon company policies; breach of contract accompanied by fraudulent act; and violation of ERISA regarding failure of the employer to provide continuation health insurance coverage. The ERISA claim was dismissed without prejudice on August 16, 2005.

Plaintiff filed his complaint in state court on April 15, 2005. Defendant removed the case to this Court on May 20, 2005, and filed its answer on May 27, 2005. Defendant filed a Motion for Summary Judgment on June 9, 2006. Plaintiff filed a response to the motion on June 11, 2006. Defendant filed a reply on June 21, 2006. Plaintiff filed a Sur-Reply on June 21, 2006.

**Summary Judgment Standard**

Defendant filed its motion for summary judgment pursuant to Rule 56, FRCP. The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56,Fed.R.Civ.P; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment

is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. *Celotex*, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The evidence relied upon must meet "the substantive evidentiary standard of proof that would apply at trial on the merits." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

## Facts

Plaintiff was employed as the store manager of Wal-Mart Store #396 in Anderson, South Carolina. In May of 2004, a meeting was conducted by Gwen Cannon, who at the time held the position of District Manager, with store managers to introduce a new pay administration system to be effective in June of 2004.[1] According to Ms. Cannon's Affidavit, she explained the new system to store managers and provided them with the new hire start rate for their stores. She states that the start rate for store #396 was $6.25 per hour. On the contrary, the plaintiff states that he was informed at the

---

[1] Prior to the implementation of the new system, the plaintiff was allegedly given the authority to adjust pay upward from the starting level of $6.50.

meeting that the starting pay rate for all stores in the district, including his store, was $6.50 per hour. "The entire pay administration program was to get stores on an equal basis." (Plaintiff's deposition, p. 65)

In November of 2004, the store's training coordinator, Tommy Stephens, attempted to add a newly hired associate to the computer system. The computer system, however, entered the associate at $6.25 per hour, and Stephens called network support. The call log states: "Ben Dearybury pay scale- facility start rate 6.25, should be 6.50." (Docket entry 25-12) The help desk responded that they would follow up on the situation and allegedly did not advise Stephens that $6.25 was in fact the correct amount.

On February 14, 2005, Stephens attempted to add three new hires to the system. The pay rate again showed $6.25 per hour. Credits were added by the plaintiff and Stephens to generate the additional $.25 per hour. Plaintiff called his regional personnel manager, Diana Gardner, concerning the situation of the new payroll system again showing a start rate of $6.25. Plaintiff alleges that Ms. Gardner did not tell him that his increasing the pay rate for the new employees at his store to $6.50 per hour was improper. (Deposition of plaintiff, p. 172) He further alleges that Ms. Gardner "started rambling about [another] store with 134 exceptions and how that looks for her region." (Plaintiff's dep., p. 17) Gardner then allegedly requested the plaintiff to gather the documentation on the pay issue and to mail it to her at her home "so attorneys could not find this with discovery." *Id*. Ms. Gardner admits that she requested that the documents be sent to her home, but she states that she does not recall discussing the reason. She states that the reason for the request was that she often does not receive mail that is sent to the company office in a timely manner, and she wanted to review the documents over the weekend. (Affidavit of Diana Gardner)

Kelly Sanchez, district assistant, signed a statement indicating that she was contacted by Gregg

May, the district manager, on February 21, 2005. She states that May requested her to contact Gardner and request a change in the start rate for the store in the payroll computer system to make it equal to the rate at the store across town. She sent an e-mail to Gardner (Docket #25-16) as follows:

> Gregg wanted me to get in touch with you about the starting pay rate for store 396. They are currently at a start rate of 6.25 and need to be at 6.50 (the same as store 644 across town also in Anderson.)
> Please let me know if you need anything else. They first realized this in November and apparently had called field support. They realized the problem still existed when they attempted to hire new associates last week.

Sanchez also states that, subsequently, on March 11, 2005, May called and requested her to go to Store #396 on March 14, 2005 to review files on all associates hired since May 29, 2004. She indicates that she met with May on March 14, 2005 and that they called Gardner to review her findings. Sanchez faxed the report to Gardner on March 17, 2005.

Plaintiff allegedly reported Gardner's comment that she wanted to hide documents from attorneys to May. A week to ten days after the February conversation initiated by the plaintiff, Gardner admitted that she had a conversation with May about her request of the plaintiff to send documents to her home. (Gardner depo., p. 33)

Plaintiff was discharged on March 30, 2005 for "gross misconduct". The exit interview form stated the reason for discharge as "falsification of company documents."

## **Analysis**

"The common law rule is that if employment is not for a definite term, and if there is no contractual or statutory restriction on the right of discharge, the employment is presumed to be terminable at the will of either party, and the employer may lawfully discharge an employee for any cause or no cause without incurring liability for wrongful discharge. *Jones v. General Electric Co.*, 331 S.C. 351, 503 S.E.2d 173 (Ct. App. 1998). Where the discharge violates a "clear mandate of public

4

policy" and where the employer has modified the at-will status of employees through an employee handbook, the employment at-will doctrine does not apply. *See Ludwick v. This Minute of Carolina, Inc.*, 287 S.C. 219, 337 S.E.2d 213 (1985); *Small v. Springs Industries, Inc.*, 292 S.C. 481, 357 S.E.2d 452 (1987) (*Small* I) ; *Small v. Springs Industries, Inc.*, 300 S.C. 481, 388 S.E.2d 808 (1990) (*Small* II)

### **Wrongful Discharge in Violation of Public Policy**

The public policy exception to the employment at-will doctrine applies where an employer requires an employee to violate the law and to situations where the reason for the employee's termination was itself a violation of criminal law. *Ludwick*; *Garner v. Morrison Knudsen Corp.*, 318 S.C. 223, 456 S.E.2d 907 (1995). The public policy exception also extends to "violation of a clear mandate of public policy." *Culler v. Blue Ridge Elec. Coop. Inc.*, 309 S.C. 243, 422 S.E.2d 91 (1992) (holding that discharge of an employee because of his political beliefs was against public policy based upon S.C. Code Ann. § 16-17-560 (1976), as amended, which states that discharging a citizen from employment on the basis of his political opinions is a misdemeanor).

While South Carolina courts have held that a wrongful discharge in violation of public policy claim is not necessarily limited to the specific situations noted above, they have carefully limited the applicability of this cause of action. For example, in *Antley v. Shepherd*, 340 S.C. 541, 532 S.E.2d 294, 298 (Ct. App. 2000), *aff'd as modified*, 349 S.C. 600, 564 S.E.2d 116 (2002), the South Carolina Court of Appeals declined to extend the public policy exception to situations where the employee was terminated for refusing to comply with a directive which she in good faith believed would require her to violate the law but would not actually be a violation of the law. Similarly, in *Miller v. Fairfield Communities, Inc.*, 299 S.C. 23, 382 S.E.2d 16 (Ct. App.1989), the Court of Appeals affirmed the grant of a motion for summary judgment on behalf of the employer, where the plaintiffs were subjected by

5

the employer to administrative sanctions but not criminal penalties. "We choose not to extend the public policy exception to include the case before us." *Id.*, 382 S.E.2d at 27.

United States District Judge Norton recently addressed a similar issue in *Greene v. Quest Diagnostics Clinical Laboratories, Inc.*, 2006 WL 2818860 (D.S.C. 2006). In *Greene*, the plaintiff was employed as a phlebotomist for the defendant. It was her understanding that, since she was not a physician, she was not allowed to enter ICD-9 codes. Plaintiff claimed that she was discharged for internally reporting such actions of other employees which she believed violated company policy and certain state and federal laws, including unauthorized practice of medicine; fraud in dealings with publicly-funded healthcare programs under 42 U.S.C. § 1320a-7b, 1395nn(a) (2006); and the False Claims Act, 31 U.S.C. §§ 3729-3733 (2006).[2]

This Court finds convincing Judge Norton's differentiation between internal reporting of an allegedly unlawful activity and external reporting of an activity, such as occurred in *Evans v. Taylor Made Sandwich Co.*, 337 S.C. 95, 522 S.E.2d 350 (1999) (employee allegedly wrongfully discharged for filing a wage complaint with the Department of Labor). Moreover, the plaintiff has not shown a violation of a criminal law. *See Merck v. Advanced Drainage Systems, Inc.*, 921 F.2d 549 (4th Cir. 1990) (public policy violation requirement is not open-ended concept but relates to violations of public policy "within the penal sphere.")

In the case at bar, the plaintiff asserts that he was terminated for reporting the actions of Gardner in advising him to send payroll documents to her home in order to avoid discovery of them by attorneys. He has not alleged that he was required to violate a criminal law or that the reason for

---

[2] The plaintiff in *Greene* also asserted claims for breach of contract based on employee handbooks and policies and breach of contract accompanied by fraudulent act. The Court granted summary judgment on these causes of action, as it found that, even if a contract existed, the plaintiff failed to prove her termination was in breach of that contract.

the termination was a violation of the criminal law. This Court does not believe that South Carolina courts would necessarily expand the public policy exception to internal reporting of alleged wrongdoing that is not alleged to violate a criminal law.

Nevertheless, it is not necessary to reach the issue of the applicability of the exception to facts such as those alleged herein, since the plaintiff has not proved a nexus between the information which Gardner allegedly requested be sent to her home and the Minnesota lawsuit, *Braun v. Wal-Mart,* which the plaintiff apparently referenced for the first time in his Memorandum in Opposition to Motion for Summary Judgment. At his deposition, the plaintiff testified as follows:

> Q. Did you have any reason to think that Diana was violating the law by asking you that? . . .
> A. I don't know if I thought it violated a law or an ethics policy at Wal-Mart. We were really in the middle of the whole Enron, Tyco, Arthur Anderson stuff going on at that point. And this ethics thing was being just beaten into associates via e-mail, communications, videos, how crucial it was to reprot anything that just didn't seem proper. . .
> Q. And so you didn't specifically know of any law that it violated when she said that.
> A. No.

Plaintiff's depo., p. 107-108.

Plaintiff has not provided any facts to support an argument that Gardner's alleged request somehow related to any pending Wal-Mart litigation. The Court has not been given any evidence regarding any actual or threatened lawsuit to which these documents might relate. Wal-Mart is probably involved in hundreds of lawsuits across the country. However, the plaintiff simply has not made anything other than vague, conclusory allegations which are not sufficient to survive a motion for summary judgment. The defendant's motion for summary judgment is granted as to the first cause of action for discharge in violation of public policy.

### **Breach of Contract**

The plaintiff alleges two bases for his claim that the employment at-will doctrine has been

altered. He first asserts that the defendant's Ethics Policy is couched in mandatory language and constitutes an implied contract for employment and that the defendant was prohibited from retaliating against the plaintiff for informing his supervisor of unethical conduct by senior management at Wal-Mart. He cites *Small I* for the proposition that "[i]t was for the jury to decide whether the handbook, the bulletin, and the oral assurances constituted an employment contract." *Id.*, 357 S.E.2d at 454. The South Carolina Supreme Court has more recently set forth in *Hessenthaler v. Tri-County Sister Help, Inc.*, 365 S.C. 101, 616 S.E. 2d 694 (2005) the applicable principles. In *Hessenthaler*, the court stated that an employer who seeks to avoid modifying the at-will employment of its employees by issuing an employee handbook "must insert a conspicuous disclaimer into the handbook." *Id.*, 616 S.E. 2d at 697. In the case at bar, the Court finds that the ethics policy had a conspicuous disclaimer as a matter of law. It states in bold print on the first full page of the policy (after the cover page and message from the CEO) that it is not intended to create a contract and that employment at Wal-Mart is at-will. "Associates are free to resign at any time for any or for no reason and Wal-Mart may terminate an Associate at any time for any or for no reason."

Under *Hessenthaler*, the Court must next determine whether the policy creates a promise. "To be enforceable in contract, general policy statements must be definitive in nature, promising specific treatment in specific situations."*Id.*, 616 S.E. 2d at 698. If the policy contains both mandatory promises and a conspicuous disclaimer, then the case should be submitted to the jury to determine whether a contract exists. *See Conner*, 560 S.E.2d at 611; *Leahy v. Starflo Corp.*, 314 S.C. 546, 548-49, 431 S.E.2d 567, 568 (1993).

The Wal-Mart Ethics Policy states that employees have a responsibility to "[i]mmediately raise any concern that you or others may have about possible violations of this Statement of Ethics or any Wal-Mart policy, or possible request or act that you believe might violate this Statement of Ethics or

a Wal-Mart policy." (Docket entry # 25-14, p.3) In fact, Defendant states: "One of the most important responsibilities Wal-Mart Associates have is the obligation to raise a concern about a possible violation . . . If you are reluctant to raise these concerns, you should remember that you can cause harm to our Company and our fellow Associates if you remain silent when you have an ethics or policy concern." *Id.*, p.5. The policy further states in bold lettering contained in a separate box in bold print "**Wal-Mart prohibits any Associate from retaliating against anyone who in good faith raises or helps to resolve an ethics problem**."*Id.*, p.3.

Plaintiff asserts that this policy is an exchange of mutual promises. He asserts that the defendant promises its employees that if they raise these concerns, then the company will not retaliate. This prohibition against retaliation is also contained in bold lettering contained in a separate box: "**No Associate who in good faith reports a suspected violation will be subject to retaliation for having made the request.**" *Id*., p. 5.  In addition to his argument that this is mandatory language, the plaintiff contends that the defendant admitted that this prohibition against retaliation is mandatory. Greg May testified in his deposition:

> Q. Does management have the discretion whether or not to follow this ethics policy?,
> A. No.
> Q. So what's in there, management has to follow.
> A Management has to follow.
> Q. It's mandatory. Correct?
> A. That's correct.

May depo., p. 12.

May further admitted that, if Gardner actually stated as the reason for her request to send the documents to her home that "attorneys could not find this with discovery," would be a violation of Wal-Mart's ethics policy.

> Q.  Would you agree with me that if Diane Gardner had requested that he send documents to her home so that attorneys could not discover them, that would be an

9

>    ethical violation of Wal-Mart's Statement of Ethics?
>    A.  If she, in fact, said that.

May depo., p. 30.

The plaintiff has presented sufficient evidence from which a reasonable jury could find that the Ethics Policy altered the at-will employment status and created a contract. *See Leahy*, 431 S.E.2d at 568.

Plaintiff has also presented sufficient evidence to submit the case to a jury as to the defendant's breach of the contract. The appropriate test on the issue of breach is as follows:

> If the fact finder finds a contract to terminate only for cause, he must determine whether the employer had a reasonable good faith belief that sufficient cause existed for termination.' *Prescott v. Farmers Telephone Co-op, Inc*., 328 S.C. 379, 393, 491 S.E.2d 698, 705 (Ct. App. 1997), *rev'd on other grounds*, 335 S.C. 330, 516 S.E.2d 923 (1999). We note that the fact finder must not focus on whether the employee actually committed misconduct; instead, the focus must be on whether the employer reasonably determined it had cause to terminate. *Id*.; *See also Small*, 292 S.C. at 483-84, 357 S.E.2d at 454.

*Conner v. City of Forest Acres*, 348 S.C. 454, 560 S.E.2d 606, 611 (2002); *see also Baril v. Aiken Regional Med. Ctr*., 352 S.C. 271,  573 S.E.2d 830, 837 (Ct. App. 2002).

Where "reasonable minds can differ as to whether just cause existed to support [the plaintiff's] termination[, it presents] a question that generally should not be resolved on summary judgment." *Conner*, 560 S.E.2d at 611–12; *Jones*, 503 S.E.2d 183-84 (Ct. App. 1998)(whether employer reasonably believed employee committed an offense was an issue of fact for the jury); *accord, Baril* (citing *Conner* for the proposition that "our Supreme Court has held that summary judgment should not ordinarily be used to resolve the question of whether an employer acted under a reasonable good faith belief that sufficient cause existed for termination."); *Gamble v. International Paper Realty Corp. of South Carolina*, 323 S.C. 367, 474 S.E.2d 438, 444 (1996)("[I]t was quite proper for the court to have submitted to the jury the question whether the present offense was 'serious' enough to allow

[defendant-employer] to forgo its normal disciplinary procedures."); *Kumpf v. United Telephone Co.*, 311 S.C. 533, 429 S.E.2d 869, 871-872 (Ct. App. 1993) (jury's determination that employee's actions did not constitute a conflict of interest supported determination that employer breached contract for discharge in violation of rule against same, when rule was not clearly stated); *cf. Hendrix v. Eastern Dist., Inc.*, 316 S.C. 34, 446 S.E.2d 440, 443 (Ct. App. 1994) ("Disputed terms of a contract are issues of fact which are for the jury's determination."), *vacated on other grounds*, 320 S.C. 218, 464 S.E.2d 112 (1995).

Viewing the evidence in the light most favorable to the plaintiff, the record contains evidence that, after Gardner allegedly made the unethical request of the plaintiff, he informed his district manager of the request; that May discussed the allegations with Gardner; that Gardner subsequently began an investigation of the plaintiff for falsification of payroll records, although she did not originally indicate to him that there was any problem with his adjustments of the hourly rate for new associates; and that, shortly thereafter, he was discharged. Whether the ethics policy altered the at-will status and created a contract is a question for the jury, along with whether there was a breach, if the jury determines there was an implied contract. Therefore, the defendant's motion for summary judgment is denied as to the plaintiff's second cause of action for breach of contract as it pertains to the ethics policy.

Plaintiff also asserts that the defendant's coaching policy, which contains different discipline levels, contains mandatory language and that the jury should be allowed to consider whether it in fact created a contract. Plaintiff also alleges in his affidavit and deposition testimony that the defendant orally communicated to its employees that the coaching policy must be followed except in cases of theft or sleeping with an associate. (Docket entry 25-13; Retherford Depo., p. 129) In addition, he testified in his deposition that, if he attempted to enter an employee's written warning into the computer

11

program when a verbal warning had not been given, then the company computer program would "flag no, there is no verbal on record for this person, so you need to take this from a written down to a verbal."

A more difficult question is presented as to whether there is sufficient evidence to go to the jury as to the coaching policy. The record does not indicate whether the coaching policy contained a disclaimer. Therefore, the Court shall proceed to the second step of the required analysis and analyze the language of the policy to determine whether it contains mandatory language requiring progressive discipline before discharge. The policy provides that "coaching for improvement" is "a more formal process designed to encourage and assist an Associate to improve their job performance . . ." "Coaching for improvement is designed to be progressive. Apply Coaching for Improvement in a fair, timely, and consistent manner." The policy also states that it applies to three behaviors: job performance, misconduct, and gross misconduct. "Any combination of these behaviors **may** result in additional disciplinary action up to and including termination." (emphasis added) Finally, the policy states that coaching for improvement will not be used in situations of gross misconduct.

Plaintiff cites *Gamble* in support of his assertion that the coaching for improvement policy creates a contract. However, in *Gamble*, the handbook contained mandatory language: "Violations of these rules **will** be handled according to our general disciplinary procedure." *Id*., 474 S.E.2d at 440-441. (emphasis added) The Court has carefully reviewed the coaching for improvement policy and finds as a matter of law that its language does not create a mandatory progressive discipline policy.[3]

---

[3] This Court reviewed the language of the coaching policy in *McCutcheon v. Wal-Mart Stores, Inc*., 2006 WL 784759 (D.S.C. 2006) (unpublished order), and found that the coaching policy used the word "may" and "cannot be construed to contain promises." The *McCutcheon* case did not involve allegations of oral assurances.

Plaintiff also contends that oral assurances or promises were made by the defendant that the disciplinary policy would be followed. He cites various South Carolina cases in support, including *Hendrix*; *Small I*; and *Jones*. However, it appears that in many of the cases there were oral assurances made in connection with mandatory language in a handbook. In other cases, oral assurances were used to modify existing written contracts.[4] The issue here is different from many of those cases because the Court has deemed the coaching policy language to be permissive rather than mandatory and there is no argument that an existing contract is being modified. The issue then becomes whether the plaintiff can simply use oral assurances to create a contract, without mandatory language, to alter employment at-will. This issue is not sufficiently briefed since the plaintiff's arguments are premised upon his argument that the coaching policy had mandatory language, which this Court has not found. The court directs the parties to further brief the issue by November 2, 2006. However, since the breach of contract cause of action is premised upon the ethics policy and/or the coaching policy, the defendant's Motion for Summary Judgment is denied as to the Second Cause of Action for breach of contract.

## **Breach of Contract Accompanied by Fraudulent Act**

A plaintiff must present facts sufficient to prove three elements for a cause of action for breach of contract accompanied by fraudulent act: "(1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach." *Conner,* 348 S.E.2d at 612. The fraudulent act "is any act characterized by dishonesty in fact, unfair dealing . . . [F]raud, in this sense, assumes so many hues and forms, that courts are compelled to content themselves with comparatively few general rules for its discovery and defeat . . . " *Harper v. Ethridge & Fann*, 290 S.C. 112, 119, 348 S.E.2d 374, 378 (Ct. App. 1986) (citation omitted), *quoting*

---

[4] *See, e.g., King v. PYA/Monarch, Inc.*, 317 S.C. 385, 453 S.E.2d 885 (1995).

*Sullivan v. Calhoun*, 117 S.C. 137, 108 S.E.189 (1921).

Plaintiff alleges in ¶22 of his Complaint that the defendant attempted to cover up its alleged breach by providing false and pretextual reasons for his discharge. Under *Conner*, fabricating reasons for an employee's discharge may constitute a fraudulent act. Based on the arguments and submissions of the parties, the Court believes that summary judgment on this cause of action is inappropriate.

## Conclusion

The defendant is accordingly entitled to summary judgment on the plaintiff's FIRST cause of action. The motion for summary judgment is DENIED as to the SECOND and THIRD causes of action. Counsel are directed to submit additional briefs on the issues directed hereinabove as to the SECOND cause of action, not to exceed five pages, by November 2, 2006.

**AND IT IS SO ORDERED.**

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Court Judge

October 30, 2006
Florence, South Carolina